**SARGENT, Plaintiff v. SARGENT, Etc., Defendant.**

Common Pleas Court, Domestic Relations Division,
Lucas County.

No. 12953.   Decided March 9, 1944.

Messrs. Benjamin Neidlinger, Toledo, and Harry B. Kirtland, Toledo, for plaintiff

Mr. Charles R. Barefoot, Toledo, for defendant and his guardian.

**OPINION**

By ALEXANDER, J.

This case comes before the.court on plaintiff's motion for new trial, the court having awarded plaintiff a divorce but denied her alimony or attorneys' fees. Her right to a divorce is not disputed.

The evidence shows that defendant, William, married his first wife, Effie, in 1905, and has lived with her more or less continuously ever since—and is still married to her. In 1942, apparently concluding that monogamy was monotony, he as-

sumed above alias and married Alma, plaintiff in this action. After two months of duplicitous bliss William gave himself away whereupon Alma forthwith summoned her brother, bundled up William, and with strict injunction against any stoppage **in transitu** shipped William back to Effie, the consignment apparently being on a sort of **quantum meruit** basis on open account rather than C. O. D. Now Alma seeks her recompense, claiming wounded pride, injured dignity, impaired social standing, and ruined reputation. A reporter might call it heart-balm; perforce Alma calls it alimony.

The evidence developed that all during her married life Effie has found William a problem child. Among his strayings off the reservation was one affair of four years' duration. After each episode Effie welcomed him back. At first she felt a slight urge to ask William personal questions about his amours, possibly not without a touch of reproof in her tone. Finding that this technique was definitely not conducive to domestic tranquility she soon learned to curb her curiosity, submerge her urge, receive him "no questions asked", and on occasion nurse him back to health and to an approximation of emotional serenity.

Which was cause and which was effect is not clear from the evidence, but at any rate William's moral deterioration was followed in 1937 by mental deterioration of sufficient magnitude to warrant the government in increasing his veteran's pension. And in 1943, shortly after Alma so righteously made restitution of William to his rightful spouse, he was duly adjudged insane and Effie was appointed his guardian. Incidentally he is now also wholly incapacitated physically, and Effie has been faithfully nursing him more than six months.

The assets accumulated by the joint efforts of William and Effie in their 38 years of life together (and apart) consist solely of the home where they live on the outskirts of Toledo; and William's pension is $100 monthly. It is out of these assets that Alma seeks her "alimony".

The trial in no whit resembled a routine contested divorce case. Instead of a plaintiff berating her husband we were treated to the anomalous spectacle of a wife giving her defendant-husband quite a "build-up"—thereby making more plausible her "falling for" him, and aggravating her damage. For Alma took the unique position that her plight was not so much attributable to William as to the woman who so inconveniently remained William's lawfully wedded wife, and who moreover, as William's guardian, had the temerity to contest

the claim for alimony. Indeed, the trial had many of the aspects of a suit for alienation of affections in reverse English, Alma casting herself in the role of the injured alienee, and forcing Effie, whose husband she had carelessly borrowed, to play the part of defendant-alienor.

Alma contended that Effie was guilty of something akin to negligence or at least of contributing to William's delinquency, in that she failed to restrain him from going off on these frolics of his own; failed to follow him; failed to use the telephone to learn his whereabouts; was too lenient with his shortcomings and outgoings, and too ready to take him back after his meanderings and philanderings—"all to plaintiff's damage in the sum, etc." she might have said. All of which Effie meekly admitted, contenting herself with pointing out that she did not have a car or telephone, did have heart trouble (physiological as well as emotional), diabetes, weighed over 200 pounds, was 66 years old, and somehow did not quite feel up to sleuthing after her elusive, errant spouse.

Cross-examination of Alma developed that she was 55, had divorced two husbands prior to her strange interlude with William; was gainfully employed as a saleswoman both before and after taking William; that she got acquainted with him as a pick-up on a downtown street when he employed the time-honored formula, "Pardon me, aren't you Tessie Lee?"; that he proposed after a couple of weeks, she accepted after a few days, and they married in three months; that he took her riding (in her car) pointing out his home and telling her he had leased it furnished "until May"; that he told her the woman they saw hanging out clothes in the yard was his tenant (it was Effie); that he brought her baskets loaded with canned fruits and vegetables which he said his good neighbors had put up for him (the good neighbor was Effie—he slipped out home from time to time and snitched them); that once a month for two months he went out "home" and picked up his pension check, which, because of some whimsical, governmental idiosyncrasy could not be mailed to him anyplace else; that although she had done business in the neighborhood of William's home she made no inquiry about William before marrying him, no effort to check up on any of his fascinating fairy tales.

Altogether Alma's marital exploit appears to be a case of voluntary assumption of risk. She had been wooed and won twice before and both stories had unhappy endings. Now she was being wooed by a streetcorner pick-up. Clearly it was a

case for the application of the doctrine of **caveat futura uxor.** She went into it with her eyes open. That they may have been blinded by love does not excuse her. **Amore stuperi neminem excusat!**

As for Effie, the charge that she maintained a sort of attractive nuisance, even if true, provides a perfect paradigm of **damnum absque injuria.** But surely Effie, already injured, is not to be damned. If to err is human, to forgive, divine, William proved his humanity and Effie was at best headed for divinity. At worst she only made practical application of the transendental doctrine first laid down by Cypher in **The New Yorker** (October 1931) and cited with approval in **Laughing Their Way,** p. 125:

"The urge to ask a personal question wrecks more lives than indigestion, infidelity, anger, vanity, murder, libel, or insanity. The cross-questioning of spouses leads to life in different houses. Though in wedlock he and she go, each maintains a separate ego. Husbands rouse much animosity by betraying curiosity, and the doubts that wives arrive at should be kept distinctly private."*

While plaintiff's plea for divorce is meritorious, we must hold her claim for alimony is not; and as the bulk of the legal services rendered by her attorneys had to do with the alimony angle we must hold their claim for fees falls in the same category as her claim for alimony. They espoused a cause which they should have known had little merit, and to require the long-suffering guardian to pay them compensation in the guise of alimony from the incapacitated defendant would be unscionable. For their justifiable services in obtaining the divorce they can look to their own client who appears to be better able to pay than defendant.

The order **pendente lite** is unaffected hereby. The motion for new trial is overruled. A journal entry may be prepared accordingly.

---

*Reprinted by special permission of the copyright owners, The F-R Publishing Corporation and The Macmillan Company, and of the author, Angela Cypher.